IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

DAVID CHARLES WHIDDEN,

        Plaintiff,

    v.                           Civil Action No.  AW-04-751

SERGEANT GARY BLAKES, Badge No.
152, *et al*.,

        Defendants.

_____

## MEMORANDUM OPINION

Plaintiff David Charles Whidden ("Whidden" or "Plaintiff") brings this 42 U.S.C. § 1983 action against the City of Hyattsville, Maryland, ("the City"), and its police officers Sergeant Gary Blakes ("officer Blakes"), and Private First Class Jenna Aubert ("officer Aubert") (collectively, "Defendants"), alleging, *inter alia*, that the officers lacked probable cause to arrest and formally charge Whidden with various offenses following an attack by Whidden's dog on an employee of the City. Currently pending before this Court is Defendants' Motion for Summary Judgment [23]. The Court has reviewed the pleadings and applicable law and has determined that a hearing is unnecessary. See Local Rule 105(6) (D. Md. 2004). For the following reasons, Defendants' Motion for Summary Judgment is granted.

## FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to the non-movant. Whidden and his wife, Suzzane Cambria ("Cambria"), lived at 4600 Hamilton Street in a residential neighborhood of the City and

owned two dogs, Bravo and Echo. Echo was a mixed Boxer. Bravo was a Boxer mixed with Pointer.[1]

Bravo was "extraordinarily well behaved," and had never bitten or frightened anyone. Bravo was so well

trained that Whidden let the dog out in the front yard "all the time" to go to the bathroom.

On September 17, 2003, at approximately 3:00 p.m, Robert Wilks ("Wilks") and Deward

Thompson ("Thompson"), members of the City's Department of Public Works ("DPW"), drove in a DPW

truck to distribute fliers to residences along Hamilton Street in the City. The fliers advised residents that

regularly scheduled household trash collection in the City had been cancelled for September 18 and 19,

due to the anticipated arrival of Hurricane Isabel. Wilks dropped Thompson off at the east end of the

block and then drove to the middle of the block and parked the truck. Thompson began delivering fliers

at the east end of the block and worked to the middle. Wilks started in the middle and worked toward the

west end of the block. The plan was that when Thompson arrived at the truck, he would drive the truck

to the end of the block and pick up Wilks.

As the plan unfolded, Wilks walked across Whidden's neighbord's yard and into Whidden's

property. Wilks took this path to Whidden's front door to avoid having to walk down to the sidewalk.

Wilks walked onto Whidden's front porch intending to leave a flier at the screen door. After stepping on

the porch, Wilks observed a mail box adjacent to the porch. Wilks then walked down the stairs leading

to the porch and placed a flier on the outside of the mailbox. Wilks then stepped off the porch steps,

---

[1] At the time that Whidden acquired Bravo, he was informed that the dog was a "boxer mix." Whidden believed that the dog was mixed with Pointer based upon his knowledge of dogs. Whidden had owned a short haired Pointer in the past. Whidden explained that Pointers have a white chest, and as Pointers get older, their white spots become darker. According to Whidden, the same thing happened to Bravo.

turned right, and headed directly toward the next house in the same manner as he went to Whidden's property.  Wilks was unable to cross into the neighbor's yard, however, because a fence blocked his path.  After seeing the fence, Wilks turned around and proceeded back across Whidden's property.

While Wilks was distributing his fliers, Whidden had not arrived home.  Whidden had decided to let Bravo out to urinate in the front yard.  Both dogs, Bravo and Echo, were at the door.  Not sure how Echo would behave off the leash, Whidden wanted to let Bravo out and keep Echo inside.  Whidden "glanced outside," then opened the door to let Bravo out.  Whidden "looked back," pushed Echo back with his leg, and then stepped out and closed the front door behind him.

As Whidden turned around, he saw Wilks standing in the front yard at the bottom of the stairs.  Wilks appeared frozen.  Bravo was running directly at Wilks.  Whidden immediately called Bravo's name.  Ignoring Whidden's call, Bravo started to jump on Wilks, and Wilks responded by kicking Bravo in the chest and pushing the dog back.  Wilks then turned and ran over a steep hill in Whidden's front yard, with Bravo chasing him.  During the chase, Whidden came off the porch and called Bravo.  By the time Whidden had reached the sidewalk in front of his house, Wilks had run across the street, tripped on the sidewalk, and fallen to the ground.  Bravo was now barking at Wilks.  Whidden yelled for Bravo, and the dog returned to Whidden.

After Whidden took control of Bravo, he observed Wilks holding his hand.  Whidden asked Wilks if he was hurt and whether he could call am ambulance for him.  Wilks declined his offer.  Whidden then took Bravo home and put him inside.  Once Bravo was secure, Whidden walked across the street to talk with Wilks.  This time Whidden offered to let Wilks in his home to clean up.  Wilks declined and said he wanted to call his supervisor.  Whidden then asked Wilks, who was wearing a "fairly generic uniform" of

blue pants and an orange shirt,  "who are you and why were you on my — in my yard."  Wilks said he was

a DPW employee and that he was handing out fliers.  Soon after, Wilkes pulled out a cell phone and began

talking to someone while walking back up Hamilton Street towards a DPW truck.

After Wilkes walked away, Whidden went home to call his wife and tell her what happened.

Whidden assumed that the police would be called and an incident report would be prepared.  While

Whidden waited inside, Wilks, Thompson, and another man came and stood in his driveway.  By this time,

a DPW truck was parked in front of Whidden's driveway.  This truck was not present when Whidden

arrived home, and Whidden does not recall seeing a DPW truck on Hamilton Street when he arrived home.

Whidden went outside to talk to the men in his driveway.  Whidden asked Wilks how he was, and

Wilks responded that "he wasn't doing very well."  The three men then turned their backs on Whidden and

Whidden went back inside and waited.

Upon arriving on the scene, officer Blakes was approached by Mike Schmidl, A DPW supervisor,

Wilks and Thompson.  Whidden was not outside when officer Blakes arrived.  After seeing officer Blakes

on the sidewalk talking with Wilkes and the two other men in a group, Whidden went outside and sat on

his steps.  Officer Blakes walked over to him in a "rude manner" and asked Whidden what type of dog

Bravo was.  Whidden answered: "mixed Bravo."  Officer Blakes started walking away, and then he came

back and asked Whidden, in an unpleasant tone, "Mixed with what?"  Whidden replied, "Pointer."  Officer

Blakes then walked away, and crossed the street to see where Wilks had fallen.

After concluding his investigation, officer Blakes approached Whidden a second time.  This time,

officer Blakes advised Whidden to lock the front door because "You're under arrest."  Officer Blakes

motioned Officer Aubert over and he took her handcuffs and put them on Whidden.  Officer Blakes then

searched him.  Whidden asked if he wanted to hear his side of the story, and officer Blakes said "I don't want to Mirandize you."  After he was handcuffed, Whidden advised officer Blakes and officer Aubert that he was a police officer, and that he did not believe that officer Blakes had conducted a proper investigation.

Officer Blakes informed Whidden that Wilkes told him that Whidden asked him what he was doing on his porch and that before Wilks could answer, Whidden opened the door and released the dog on him. Further, Wilkes told officer Blakes that Whidden "never really called the dog back."  officer Blakes also stated that Thompson told him that he saw Whidden's door open, and the dog come running out and chase Wilks across the street.

Officer Blakes instructed officer Aubert to place Whidden under arrest.  He then waited for an Animal Control Officer to arrive "to give us an interpretation of whether this [dog] was a pitbull or not." Initially, officer Blakes instructed officer Aubert to charge Whidden with Assault in the First Degree. Because Whidden was a police officer, officer Blakes later instructed officer Aubert to change the charge to assault in the second degree.  According to officer Blakes, the animal "definitely was a pit bull." Whidden's wife also said that it was  a pit bull.  After learning this information, officer Blakes instructed officer Aubert to charge Whidden with violating Prince George's County pit bull ordinance for having an unregistered dog and with assault in the first degree.  Because Whidden was a police officer, officer Blakes later instructed officer Aubert to change the charge to assault in the second degree.[2]

---

[2] The arrest report prepared by officer Aubert reveals that she ultimately charged Whidden with violating the pit bull ordinance and Assault in the Second Degree.

At 6:18 p.m. that same day, Gerald Washington ("Washington"), an Animal Control officer, arrived on the scene. Cambria informed Washington that she was aware that her dog had chased a citizen and brought the dog to him. Cambria informed Washington that the dog was a "mixed boxer." Washington requested to take the dog to have its breed evaluated, and Cambria agreed. Washington informed the officers on the scene that "it might be a pit, but I will let a supervisor determine and make the call."

Joseph Mattingly, a supervisor of the Prince George's Animal Control Division, along with Chief Taylor, examined Bravo. Mattingly and Taylor concluded that "we could clearly see [that] the majority of the dog was not pit bull." The determination of a dog's breed is made by looking at the dog's jaw line, muscle tone, body cavity, and chest. A pit bull has more developed muscles in the neck, shoulders, and legs; the teeth line up; and a pit bull has a more defined jaw muscle. According to Mattingly, Bravo clearly lacked these characteristics. Mattingly tried to call officer Blakes two or three times to notify him that the dog was not a pit bull, but officer Blakes never returned his calls. Mattingly notified another officer, Suzette Johnson, to inform officer Blakes of the dog's breed.

Whidden was eventually taken before a Commissioner, who determined that probable cause existed to charge Whidden with assault in the second degree and violating the unregistered pit bull ordinance. Whidden was eventually released after four hours in custody.

On March 15, 2004, Whidden brought this action in this Court. On April 4, 2004, Whidden filed an Amended Complaint, and on May 18, 2004 Whidden filed a Second Amended Complaint. On May 27, 2004, Whidden filed a Third Amended Complaint, alleging federal 42 U.S.C. § 1983 claims for unlawful arrest and malicious prosecution, as well as state tort claims of false arrest, false imprisonment, battery, and a state constitutional claim of unreasonable seizure.

On January 10, 2005, Defendants filed a Motion for Summary Judgment. This motion is ripe and an opinion is now issued.

### STANDARD OF REVIEW

Defendants assert that they are entitled to summary judgment as a matter of law on each of Plaintiff's claims against them.[3] Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986). Once the moving party discharges its burden by showing there is an absence of evidence to support the nonmoving party's case, Catrett, 477 U.S. at 325, the nonmoving party must come forward with specific facts showing there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Defendants also assert that individual Defendants officer Blakes and officer Aubert are entitled to qualified immunity on Plaintiff's § 1983 claims. Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

---

[3] Based on Plaintiff's Third Amended Complaint, Plaintiff's six counts are against individual Defendants officer Blakes and officer Aubert. Only Plaintiff's Count VI, alleging a violation of Articles 24 and 26 of the Maryland Constitution, is against the City and individual Defendants officer Blakes and officer Aubert.

Qualified immunity protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

The steps in the qualified immunity analysis are sequential. First, a court must determine whether the evidence, "[t]aken in the light most favorable to the party asserting the injury," shows that the official's conduct violated a statutory or constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). Next, assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right. Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002) (citations omitted).

## DISCUSSION

**I.      Qualified Immunity & Section 1983 Claims**

**A.      Violation of a Constitutional Right**

The Court's first task, then, is to resolve whether, based on the evidence "[t]aken in the light most favorable" to Whidden, a reasonable jury could find that officers Blakes's and Aubert's conduct "violated a constitutional right." Saucier, 533 U.S. at 201. Whidden asserts a federal cause of action under § 1983 stating causes of action for unlawful arrest and malicious prosecution. In particular, both of Whidden's claims rest upon the allegation that officers Blakes and Aubert arrested him without probable cause in violation of the Fourth Amendment.

Because § 1983 does not provide redress for violations of state law, the Fourth Circuit has emphasized that "there is no such thing as a § 1983 malicious prosecution claim." See Lambert v. Williams, 223 F.3d 257, 262 (4th Cir. 2000) ("What we term a 'malicious prosecution' claim is simply a claim

founded on a Fourth Amendment seizure that incorporates the elements of the analogous common law tort of malicious prosecution, [as such], it is not an independent cause of action."); Rogers v. Pendleton, 249 F.3d 279, 294 (4th Cir. 2001) ("Rogers malicious prosecution claim is so intertwined legally with his false arrest claim as to stand or fall with that claim for qualified immunity purposes. We conclude that this claim is wholly derivative of the false arrest claim for qualified immunity purposes and thus do not analyze it separately.") (internal citations omitted). As such, this Court must address officers Blakes's and Aubert's conduct — both in terms of the arrest and the subsequent criminal prosecution — must be evaluated solely by reference to the Fourth Amendment's prohibition against unreasonable seizures.

To establish an unreasonable seizure under the Fourth Amendment, Whidden must demonstrate that the officers lacked probable cause to arrest him. Dunaway v. New York, 442 U.S. 200, 213 (1979); see also Brown, 278 F.3d at 367.[4] Probable cause is determined from the totality of the circumstances known to an officer at the time of the arrest. United States v. Garcia, 848 F.2d 58, 59-60 (4th Cir. 1988). For probable cause to exist, there need be only enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed. Wong Sun v. United States, 371 U.S. 471, 479 (1963). Two factors govern the determination of probable cause in any situation: "the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992). Therefore, probable cause "could be lacking in a given

---

[4] To establish a § 1983 claim for false arrest, a plaintiff must demonstrate that an officer lacked probable cause to arrest. Street v. Surdyka, 492 F.2d 368, 372-73 (4th Cir. 1974). Under Maryland law, to establish a common-law claim for malicious prosecution a plaintiff must establish, *inter alia*, that the defendant lacked probable cause to institute the proceedings. Candelero v. Cole, 831 A.2d 495, 500 (Md. App. 2003).

case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both." Id.

Whidden contends that a reasonable jury could find that a reasonable police officer under the circumstances would have determined that an "unfortunate accident had taken place, not that [Whidden] had intentionally released his dog to maul Wilks." This Court cannot agree.

Under Maryland law, the crime of assault in the first degree is defined in relevant part as follows: "A person may not intentionally cause or attempt to cause serious physical injury to another." Md. Code Ann. Crim. Law § 3-202 (2002). Prince George's County local ordinance prohibits owning a pit bull terrier in Prince George's County, unless the dog was acquired prior to November 1, 1996 and the dog is registered with the County. See Prince George's County Code § 3-116.01.

Considering the totality of circumstances of which officer Blakes had at the time, this Court finds sufficient information to justify a reasonable believe that Whidden committed assault in the first degree. First, officer Blakes interviewed both the victim, Wilks, and an eyewitness, Thompson, who both informed officer Blakes that they believed Whidden intentionally released Bravo to attack Wilks. According to officer Blakes, he asked Wilkes whether he believed Whidden intentionally released Bravo on him, and Wilks responded with an unequivocal "Yes." Thompson also informed Blakes that he observed the dog come out and chase Wilkes across the street, and he observed Whidden walking towards where the dog was with a smile on his face. Additionally, Blakes also observed, first-hand, Bravo's behavior. Blakes observed Bravo "in an aggressive manner, barking, growling," in the doorway of Whidden's home. Officer Blakes also had the benefit of hearing from Whidden himself. Although there are conflicting testimony regarding at when Whidden made the statement "who are you and why were you on my — in my yard,"

10

it is undisputed that Whidden let Bravo out into the front yard, Bravo chased Wilkes across the street, and Wilkes fell during the chase. Based on these circumstances, this Court finds that Officer Blakes had probable cause to arrest Whidden for assault in the first degree.

Based on the totality of circumstances of which officer Blakes had at the time, this Court also finds sufficient information to justify a reasonable believe that Whidden violated the ordinance prohibiting a pit bull. Officer Blakes interviewed Wilkes, and he described Bravo as "a small brown dog that looked like a pitbull." Officer Blakes observed Bravo through the screen door of Whidden's home and observed a dog which was "really barking, jumping up and down in an aggressive manner." Based on his own observation, officer Blakes believed the aggressive dog was indeed a pit bull. Officer Blakes's observation was supported by Animal Control officer Washington, who also initially believed, based on his own observation, that Bravo was a pit bull. Under these circumstances, officer Blakes had a reasonable belief that Whidden was violating the ordinance prohibiting pit bulls.

Whidden attempts to salvage his claim by contending that the officers investigation was insufficient. Whidden's contention is premised upon two considerations. First, had the officers interviewed Whidden prior to arresting him, the officers would not have had probable cause to arrest him. Second, had the officers interviewed his neighbors, Margaret Rita Lawrence ("Lawrence") and Ken and Mae Worsham ("Worshams"), they would have informed the officers that Bravo was a "friendly dog and not likely to bite anyone." These arguments are unpersuasive.

Whidden's argument that the officers are not entitled to qualified immunity is based simply on the fact that the officers relied on Whidden's statement without interviewing him or his neighbors prior to seeking Whidden's arrest. The Fourth Circuit, however, has clearly stated that "[t]he decision of whether

11

or not to interview is inescapably discretionary, and [courts] are reluctant to imply an abrogation of immunity on the sole basis of the absence of an interview." <u>Torchinsky v. Siwinski</u>, 942 F.2d 257, 264 (4th Cir. 1991).  In particular, the Fourth Circuit has properly cautioned that "a reasonable officer must [not] exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established."  <u>Id.</u>; <u>see</u> also <u>Krause v. Bennett</u>, 887 F.2d 362, 371 (2d Cir. 1989) ("Probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful.").

Here, Whidden point out that had the officer Blakes and Aubert interviewed Whidden, the officers would have learned that:  (1) Whidden did not know Wilkes was present at the precise time he let Bravo outside and that he never acknowledged Wilkes presence before doing so; (2) Whidden tried to recall Bravo before Wilkes starting running; and (3) Whidden released Bravo into the front yard with the intent of allowing Bravo to use the bathroom not to attack Wilkes.  Whidden also points out that had the officers interviewed Whidden's neighbors, the officers would have learned that Bravo was not dangerous.

It bears reminding, however, that the officers probable cause determination was based on their own observations of Bravo, the statements of the victim and an eyewitness, and the initial opinion of an Animal Control expert.  Additionally, the officers had the voluntary statement of Whidden that he released Bravo into the front yard. Whidden essentially admitted to having released Bravo when he "offered to tell his side of the story at the scene."  While this Court can say, with the benefit of hindsight absent to officers on the streets, that the officers here could have interviewed Whidden and his neighbors to gain more certainty that probable cause existed, the mere failure to exercise their discretion to conduct such interviews does not diminish the existence of probable cause at that particular time.  As the Fourth Circuit has aptly noted:

12

It will, of course, always be possible to contend in court that an arresting officer might have gathered more evidence, but judges cannot pursue all the steps a police officer *might* have taken that *might* have shaken his belief in the existence of probable cause. Certainly in hindsight one wishes this arrest had not occurred, but with hindsight it becomes far easier to portray any person charged with making a close discretionary decision in a pejorative light.

Torchinsky, 942 F.2d at 264 (emphasis in original).

In their affidavits, Whidden's neighbors the Worshams's both state that they do not "believe" that Bravo would bite anyone. Additionally, Whiden's neighbor Lawrence states that Bravo was a "gentle dog." However, mere conclusory statements, not grounded in specific facts, are insufficient to avoid summary judgment. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996) ("unsubstantiated allegations and bald assertions" do not raise a genuine issue of material fact for trial). The neighbors bald allegations of Bravo's virtues have no bearing on determining whether a material dispute exists over whether officer Blakes had probable cause to arrest Whidden. Furthermore, the record does not show that Whidden's neighbors, Lawrence and the Worshams, were even eyewitnesses to the incident. Hence, this Court cannot conclude that the officer Blakes was required to interview Whidden's neighbors before arresting him.

Moreover, Whidden's arguments are premised on his unconvincing reliance on Sevigny v. Dicksey, 846 F.2d 953 (4th Cir. 1988). In Sevigny, plaintiff Diana Sevigny, a single mother of two children, had her almost four year old son jump into her car without her knowledge or instructions, start the car with the keys left by a friend whom Sevigny had lent the car to, and cause the car to lurch forward and crash into the garage. Id. at 954. Officer Dicksey responded to the call, surveyed the accident scene and questioned Sevigny, who told him what had happened. Id. at 955. Dicksey did not believe Sevigny, and expressed

13

his opinion that she in fact had driven the car through the garage and was trying to place the blame for the accident on her son.  Id.  Dicksey arrested Sevigny, without questioning neighbors who could have confirmed her version of the story, and charged Sevigny with misdemeanor child abuse — a charge based upon her version of the events; and willful and wanton damage to real property — a charge based upon his belief that Sevigny had actually caused the damage.  Id.

The Fourth Circuit found that officer Dicksey acted without probable cause.  In so doing, the Fourth Circuit relied upon the fact that Dicksey charged Sevigny with two separate offenses involving "mutually inconsistent factual theories: that Sevigny herself had run the car into the building; [and] that her child had done so."  Id. at 957.  Thus, the Fourth Circuit found a gap in logic insofar as because "[b]oth [theories] could not have been proven, and any officer acting reasonably would have realized that this made the existence of probable cause for both highly questionable, if not logically impossible."  Id.  Additionally, the Fourth Circuit found probable cause absent here because "had Dicksey made even rudimentary inquiries of neighbors then on the scene, they would have verified Sevigny's assertion that her child, not she, had done the property damage."  Id.

The instant case is distinguishable from Sevigny.  First, and most obvious, Whidden was not charged with "mutually inconsistent factual theories" of which only one could logically stand.  Both of the charges filed against Whidden — assault in the first degree and the local ordinance prohibiting the ownership of a pit bull — were related to Whidden as the perpetrator of the attack on Wilkes.  As such, there is no logical gap present here, as was the case in Sevigny.  Moreover, it is undisputed that Whidden was responsible for releasing his dog, and thereby setting the events here into motion.  Furthermore, there is no evidence that officer Blakes did not avail himself of readily available information that could have

14

verified Whidden's story.  The only witnesses identified by Whidden are Lawrence and the Worshams, neither of whom actually saw the incident as it unfolded.

Similarly, this Court cannot find Whidden's reliance on Clipper v. Takoma Park, 876 F.2d 17 (4th Cir. 1989) persuasive.  Clipper involved a police officer's failure to investigate readily exculpatory evidence relating to the arrest of a suspect for bank robbery: statements of neighbors, identified by the suspect, who could have substantiated his alibi and bank surveillance camera photos of the robbery.  The Fourth Circuit held that the officer's failure to factor this evidence into his investigation substantiated the jury's conclusion that the officer acted without probable cause.  Id. at 19-20.  In Clipper, the Fourth Circuit cautioned that a police officer's failure to pursue potentially exculpatory evidence was not in itself sufficient to negate probable cause.  Id. at 20.  Nevertheless, the Fourth Circuit found that evidence of probable cause lacking because the police officer failed to pursue "evidence [that he] might have obtained from individuals who could have told [him] that Clipper *could not have robbed the bank* because he was at another place at the time of the robbery."  Id. at 19 (emphasis added).

The instant case is also distinguishable from Clipper.  Here, there is no conflict regarding the identity of the suspect.  Indeed, it is undisputed that the Whidden was both the proper *suspect* and the he was responsible for releasing Bravo into the front yard.  As previously mentioned, Whidden admitted at the scene that he released Bravo, and the victim, Wilkes, identified Whidden as having been responsible for releasing Bravo.  Under these circumstances, further investigation of Whidden or his neighbors regarding whether Whidden released Bravo was unnecessary.  Moreover, in contrast to the officer in Clipper, officer Blakes did not ignore readily available exculpatory evidence of which he had been made aware.  As previously mentioned, the only witnesses identified by Whidden are Lawrence and the Worshams, neither

of whom actually saw the incident as it unfolded.

In short, based on his own observations, the testimony of eyewitnesses, and the voluntary statement of Whidden, officer Blakes had sufficient information to establish probable cause to arrest Whidden. Similarly, the information officer Blakes used to establish probable cause is transferable to officer Aubert and can serve as the basis for her to develop probable cause. See United States v. Gaither, 527 F.2d 456, 458 (4th Cir. 1975) (holding that "probable cause can rest upon the collective knowledge of the police, rather than solely that of the officer who actually makes the arrest."). Thus, for the aforementioned reasons regarding the sufficiency of the information used by officer Blakes to establish probable cause to arrest Whidden, officer Aubert is similarly entitled to summary judgment on Whidden's unlawful arrest and malicious prosecution claims.

### B.      Objective Reasonableness

Even assuming the officers arrested Whidden without probable cause, the officers are still entitled to qualified immunity and Whidden's suit is therefore barred. See e.g., Torchinsky, 942 F.2d at 260. In other words, a plaintiff may prove that an official has violated his rights but an official is nonetheless entitled to qualified immunity if a reasonable person in the "official's position could have failed to appreciate that his conduct would violate" those rights. Collinson v. Gott, 895 F.2d 994, 998 (4th Cir. 1990). The very idea of reasonableness requires that courts accord interpretive latitude to official judgments. Sevigny, 846 F.2d at 957. If reasonable mistakes were actionable, difficult questions of discretion would always be resolved in favor of inaction, and effective law enforcement would be lost. Torchinsky, 942 F.2d at 261.

A reasonable official in the officers position could have failed to appreciate that his or her conduct would violate Whidden's Fourth Amendment right to an unreasonable seizure. The officers interviewed

the victim, and an eyewitness that both testified that they believed Whidden intentionally released Bravo

to attack Wilks, and Wilkes even described Bravo as "a small brown dog that looked like a pitbull." Officer

Blakes also observed, first-hand, Bravo's acting "in an aggressive manner, barking, [and] growling." Based

on his own observation, officer Blakes believed the aggressive dog was indeed a pit bull. Officer Blakes's

observation was supported by Animal Control officer Washington, who also initially believed, based on

his own observation, that Bravo was a pit bull.  It is also undisputed that Whidden let Bravo out into the

front yard, Bravo chased Wilkes across the street, and Wilkes fell during the chase.  Based on these facts,

this Court finds that the officers conduct in arresting Whidden was objectively reasonable.

In sum, this Court finds that officers Blakes and Aubert had probable cause to arrest Whidden

without a warrant.  In the alternative, even if officers Blakes and Aubert lacked probable cause, they are

entitled to qualified immunity on Whidden's Section 1983 claims as their actions were objectively

reasonable.

## II.      State Common Law & Constitutional Claims

### A.      Immunity for State Common Law Claims

Defendants allege that officers Blakes and Aubert are entitled to statutory immunity for Whidden's

common law claims of false imprisonment, false arrest, and battery.[5]  Public official immunity relieves a

government official of liability for his negligent acts.  <u>Kebe v. Brown</u>, 161 F.Supp.2d 634, 644 (D. Md.

---

[5] Defendants also allege that officers Blakes and Aubert are entitled to statutory immunity for Whidden's state constitutional law claims.  This argument lacks merit.  Under Maryland law, "unlike an action for some common law torts, neither the local government official nor a local government entity has available any governmental immunity in an action based on rights protected by the State Constitution."  <u>DiPino</u>, 354 Md. At 371.

2001) (citing <u>DiPino v. Davis</u>, 354 Md. 18, 49 (1999)).  Two factors required to find this type of immunity

are:  (1) "the individual actor, whose conduct is at issue must be a public official rather than a mere

government employee or agent" and (2) the tortious conduct must have occurred "while he was performing

discretionary, as opposed to ministerial acts in furtherance of his official duties."  <u>Id.</u>  (citation omitted).

Police officers are public officials who,  when carrying out their official duties, receive immunity in the

absence of actual malice.  <u>DiPino</u>, 354 Md. at 49.  It is undisputed that officers Blakes and Aubert were

police officers carrying out their official duties at the time Whidden was arrested.  Therefore, the only

question here is whether the officers acted with malice.  Thus, to pierce the shield of public official immunity

and survive summary judgment on his state common law claim, Whidden must demonstrate that, taking the

facts in the light most favorable to him, a jury could reasonably believe that the officers acted with malice.

Malice is established by proof that defendants intentionally performed "an act without legal justification or

excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and

wilfully injure Plaintiff."  <u>Williams v. Mayor & City Council of Baltimore</u>, 359 Md. 101, 131 n. 16 (2000).

      Even assuming the arrest occurred as alleged by Whidden, he has put forth no evidence that the

officers performed the arrest with an evil or rancorous motive or that the officers sought deliberately to

injure Whidden.  It is undisputed that Whidden did not know officers Blakes and Aubert prior to

September 17, 2003.  Hence, there is no underlying history of animosity or ill will between the parties.  Nor

does the record suggest that any of officer Blakes's or officer Aubert's actions in relation to the decision

to arrest Whidden were motivated by ill will, improper motive, or an affirmative intent to injure.  Indeed,

the record is devoid of any evidence that officers Blakes's and Aubert's actions were motivated by anything

other than taking into custody an individual that they reasonably believed intentionally released Bravo to

attack Wilks.  Accordingly, Whidden cannot establish that officers Blakes's and Aubert's actions were malicious, and consequently, the officers are entitled to statutory immunity under Maryland law.

**B.      State Constitutional Claims**

Whidden also claims that officers Blakes and Aubert violated his state constitutional rights under Article 24 and Article 26 of the Maryland Declaration of Rights.  Article 24 and Article 25 of the Maryland Declaration of Rights are construed *in pari materia* with their respective federal constitutional counterparts. See Gadson v. State, 341 Md. 1, 8 n.3 (1995) (Article 26 is *in pari materia* with the Fourth Amendment); Kirsch v. Prince George's County, 331 Md. 89, 96 (1995) (Article 26 is *in pari materia* with comparable rights in Fifth and Fourteenth Amendments).

As applied here, the uncontroverted evidence demonstrates that neither officer Blakes nor officer Aubert unlawfully seized Whidden in violation of the Fourth Amendment to the federal Constitution. Accordingly, officers Blakes and Aubert must prevail as to Whidden's state constitutional claim arising under Articles 24 and 26 of the Maryland Declaration of Rights.

Similarly, under Maryland law, local government entities do have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of their employment.  DiPino, 354 Md. at 52.  Consequently, a plaintiff's claims against a municipal employer are ordinarily "inextricably" intertwined with the claims brought against its employees. Id. at 57.  Stated differently, if a plaintiff's claims against the employer fails, his *resondeat superior* claims against the municipal employer must also fail.  Id.

Here, Whidden's sole claim against the City is based upon an alleged violation of the Maryland Declaration of Rights.  Because Whidden fails to allege that the City independently violated his civil rights,

the sole basis for Whidden's claim against the City is based upon *respondeat superior*.  Based upon the reasoning above, neither officer Blakes nor officer Aubert violated Whidden's rights as guaranteed by the Maryland Declaration of Rights.  Accordingly, Whidden's sole claim against the City must also fail, and the City is entitled to summary judgment on Whidden's sole claim against it.

## CONCLUSION

For the reasons mentioned above, Defendants' Motion for Summary Judgment is GRANTED. An Order consistent with this Opinion will follow.


<u>July 27, 2005</u>                                          <u>                    /s/                    </u>
Date                                                               Alexander Williams, Jr.
                                                                   United States District Judge